## Wagner v. Philadelphia & Reading Coal and Iron Co.

*Workmen's compensation—Injury in course of employment—Death—Evidence—Carcinoma of the esophagus.*

1. An award in favor of a widow of a workman will be sustained where the evidence shows that the decedent for some time prior to his death was suffering from carcinoma of the esophagus, that on the day before his death, while chopping a board with a hatchet in the course of his employment, a hemorrhage seized him, and the medical testimony shows that he died from carcinoma of the esophagus and the hemorrhage resulting from the exertion.

2. In such a case, it is immaterial that the opinion of the expert was that the hemorrhage might have happened at any time and anywhere under ordinary exertion by the deceased.

Appeal by defendant from the award of the Workmen's Compensation Board. C. P. Schuylkill Co., May T., 1926, No. 553.

*Roger Dever*, for claimant; *John F. Whalen*, for defendant.

KOCH, J., June 28, 1926.—The defendant's exceptions raise the question whether there is competent evidence to sustain certain basic findings by the referee. Said basic findings by the referee read as follows:

"1. The claimant is the dependent widow of one Robert Wagner, who died Sept. 10, 1925. The latter was in the employ of the defendant company on and before Sept. 9, 1925, as a waterman in its Maple Hill Colliery, which is located in Schuylkill County, Pennsylvania. He was afflicted with carcinoma of the esophagus for some months. On Sept. 9, 1925, while in the employ of the defendant company, he stooped over and chopped a board with a hatchet. He was resting his one knee on a bench, had hold of the board with his left hand and did the chopping with his right hand. In doing this, his posture was stooping. Shortly thereafter, a hemorrhage seized the decedent. It came from the cancerous esophagus and was superinduced by the exertion he put forth in chopping the board before mentioned. He was taken home and died the following day."

There is contradictory evidence on the question of whether the employee chopped a board with a hatchet and by that exertion caused a hemorrhage of his cancerous esophagus resulting in death.

As to the chopping of the board, we will refer to the testimony of Ed. A. Wagner, a son of the complainant, who testified that he and his father were working about thirty feet apart in the neighborhood of each other on Sept. 9, 1925, and that the last work he saw his father doing was "kneeling down, fixing the door-jamb," "with a hatchet," "chopping a board." "He was down on his knee and held the board with his knee and left hand and chopped with the right hand," about five minutes. A man named O'Neil, this son and his father had made a door for the defendant's pump-house a day or two before the father had the hemorrhage. The son and his father had started to work about 1.30 P. M. "I saw him kneeling at the board after he had sawed it," "about the centre where the charts were." "Q. Are you certain that he was working with a hatchet, chopping a piece of board in the pump-house on that day? A. Yes, sir." The purpose of the door was to keep the pump-house warm in winter. He saw his father coming from the pump-house to the boiler-house five minutes after he had seen him in the pump-house. The father entered the boiler-house between boilers Nos. 11 and 13. "Q. What was he doing when he came between the boilers? A. He had his hand on the water-valve and he called me over and Bill O'Neil. He had his hand on the valve. He hollered for me and I said, 'What is the matter, pop?' and he said, 'I think I am going to die; something busted.'" He was bleeding from the

mouth. When he got to his father, his father was in a standing position. It seems his father then sat down on the railroad track, and Ed. and O'Neil took him up and carried him and he collapsed. Ed. says, before that, his father was in good condition, able to work and to be around. He thinks the piece of board was longer than three feet.

Over the defendant's objection, the referee admitted the son to say that his father's exertion in what he was doing was extreme.

When Dr. R. R. Keiser was examined as a witness, he said that his final diagnosis of the cause of death was carcinoma of the esophagus. This appears in his testimony: "Q. You heard the testimony of this man chopping a piece of board when he took the hemorrhage; in your opinion, did that exertion cause the final break? . . . A. I will answer the question and then qualify my statement. My opinion first is, yes. The statement that I made 'yes' I would like to qualify, and say that, owing to the carcimona this man had, which had eaten away the walls of the vessels, the exertion and his condition would cause that sort of thing. Q. He was in bad condition before he exerted himself? A. Yes, sir. Q. And any exertion such as testified to would cause the final break? A. Yes, sir. Q. Didn't cause the carcimona? A. No. Q. It was there? A. Yes." This doctor had advised the decedent's family sometime before he died that they should try to keep him at home. "If there was no exertion connected with his duty something might have happened." "Q. Would it have to be exertion above the customary duties of a waterman? A. Well, now that is going pretty deep into the question. Q. What is your professional judgment? A. My best professional judgment, to make matters simple, if that man were walking on the street at a rapid gate, a little above the average, it could have happened the same way. Q. It could happen anywhere under usual exertion incurred by the man? A. Yes, sir. Q. Taking into consideration all these circumstances, what is your best professional judgment as to the most probable cause of his death? A. Primarily, carcinoma; secondary, hemorrhage."

The testimony that was introduced to contradict Ed's statement that his father had chopped a piece of board tended to show that the door had been finished the previous week and that there was no occasion to chop any board to be used in connection with the completion of the door at the pump-house. But the credibility of the witnesses was for the referee alone.

Dr. A. J. Berkheiser, who was called on behalf of the defendant, went to the Maple Hill Colliery and saw Robert Wagner between five and six o'clock in the evening of Sept. 9th, and he had a very bad hemorrhage. His best judgment is that Mr. Wagner's death was owing to carcimona of the esophagus, primarily, and, secondarily, to hemorrhage. Referring to his condition, this doctor said that exertion of any kind in a man in that condition is a detriment, and that, in order to prolong life, he should have been kept at rest, and that he could have died in bed with the same condition. Almost any kind of exertion is likely to bring on such a condition. "Could expect it most any time."

Dr. P. B. Mulligan, of the Miners Hospital, made an X-ray examination of Robert Wagner in June, 1925, and discovered carcimona of the esophagus.

As Dr. Keiser gave it as his opinion that the exertion of chopping the board caused the break of the blood vessel and brought on the hemorrhage which was the direct cause of Robert Wagner's death, the referee had sufficient evidence to warrant his finding, and his award, as affirmed by the board, may not be disturbed by us.

From M. M. Burke, Shenandoah, Pa.